2022R001002/ALW

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Jessica S. Allen |
| v. | : | Magistrate. No. 24-8293 |
| TODD O'GARA | : | **CRIMINAL COMPLAINT** |

I, Anthony Bellitti, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

**SEE ATTACHMENT A**

I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this complaint is based on the following facts:

**SEE ATTACHMENT B**

continued on the attached pages and made a part hereof.

_____
Anthony Bellitti, Special Agent
Federal Bureau of Investigation

Special Agent Bellitti attested to this Affidavit by telephone pursuant to F.R.C.P. 4.1(B)(2)(A) on this 3rd day of December, 2024.

S/Hon. Jessica S. Allen
_____
Hon. Jessica S. Allen
United States Magistrate Judge

2022R001002/ALW

# ATTACHMENT A

From at least in or around August 2019 through at least in or around October 2024, in the District of New Jersey, and elsewhere, the defendant,

## TODD O'GARA,

knowingly and intentionally devised and intended to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and, for the purpose of executing and attempting to execute such scheme and artifice, did transmit and cause to be transmitted, by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, specifically, on or about February 27, 2020, O'GARA caused Victim-2 to transfer approximately $250,000 to Wanu, Inc.'s bank account at Bank-1 via an interstate wire transfer that passed through New Jersey.

In violation of Title 18, United States Code, Section 1343.

## ATTACHMENT B

I, Anthony Bellitti, a Special Agent of the Federal Bureau of Investigation ("FBI"), having conducted an investigation and having discussed this matter with other law enforcement officers who have participated in this investigation, have knowledge of the following facts. Because this Complaint is being submitted for a limited purpose, I have not set forth every fact that I know concerning this investigation. Rather, I have set forth only the facts that I believe are necessary to establish probable cause. Unless specifically indicated, all dates described in this affidavit are approximate and all conversations and statements described in this affidavit are related in substance and in part.

### Overview

1. The defendant TODD O'GARA ("O'GARA") who founded, and held various leadership positions at, Wanu Water, Inc., ("Wanu"), a beverage company, made false statements and promises to victims to induce them to invest in Wanu. Among other things, O'GARA lied to investors about his education and professional credentials, about retailers' purchase orders for Wanu, and about interest and commitments from other individual and institutional investors. For instance, in or around late 2019 and early 2020, O'GARA lied to investors about the size of purchase orders from a major retailer, made false claims to investors that a private equity firm had agreed to make a large investment in Wanu, and circulated a forged term sheet purporting to memorialize the private equity firm's agreement to invest.

### Relevant Entities and Individuals

2. At all times relevant to this Complaint:

   a. Wanu was a beverage company incorporated in Delaware.

   b. O'GARA was the Founder and Executive Chairman of Wanu and maintained an ownership stake in Wanu.

   c. PE Firm-1 was a private equity firm in Greenwich, Connecticut. PE Firm Partner-1 and PE Firm Partner-2 were partners at PE Firm-1.

   d. Retailer-1 was a national retail chain with headquarters in Issaquah, Washington.

   e. Victim-1 was an individual investor who resided in Cresskill, New Jersey.

   f. Victim-2 was an individual investor who resided in Garden City, New York.

    g. Victim-3 was an individual investor who resided in Woodland Hills, California.

    h. Bank-1 was a U.S.-based financial institution.

    i. The Federal Reserve Bank operated the Federal Wire Transfer Network ("Fedwire"), which is an electronic funds-transfer system used primarily for the transmission and settlement of certain payment orders.

    j. At all times relevant to this Complaint, money transmitted by Fedwire was routed via electronic wire from its origin to its destination through the District of New Jersey

## The Scheme

*Background*

3. In or around the summer of 2019, Wanu's product, Wanu Water, which had been on the market for several years, was being sold both by brick-and-mortar retailers and online marketplaces but was losing money on an annual basis.

4. As of in or around September 2019, Wanu was projecting losses of approximately $3.77 million dollars for the 2019 calendar year.

5. In need of capital, O'GARA sought additional money from outside investors, including both institutional investors and individuals.

*Discussions with PE Firm-1*

6. On or about August 30, 2019, O'GARA met with PE Firm Partner-1 and PE Firm Partner-2 to solicit an investment by PE Firm-1 in Wanu.

7. On or about September 6, 2019, Wanu and PE Firm-1 entered into a non-disclosure agreement to allow for the confidential exchange of information while PE Firm-1 considered an investment in Wanu.

8. On or about September 12, 2019, O'GARA sent PE Firm-1 a term sheet proposing an investment in Wanu at a pre-money valuation, or the company's valuation before any additional fundraising, of approximately $30 million.

9. Over approximately the next two weeks, O'GARA and Wanu's Chief Operating Officer ("Wanu Executive-1"), exchanged emails with representatives of PE Firm-1 about providing due diligence material to PE Firm-1.

10.   On or about September 25, 2019, Wanu Executive-1 sent PE Firm Partner-2 information concerning Wanu's past financial performance and future plans and projections (the "Diligence Material").

11.   On or about October 16, 2019, PE Firm Partner-2 sent an email to O'GARA and Wanu Executive-1 telling them that PE Firm-1 had considered the Diligence Material and decided not to invest in Wanu.

12.   Between in or around October 2019 and in or around October 2021, O'GARA continued to have occasional contact with PE Firm-1 about a potential investment in Wanu, including discussions about an investment by PE Firm-1 and a joint-venture partner (the "JV Partner").

13.   On or about October 15, 2021, PE Firm Partner-2 emailed O'GARA to again tell him that PE Firm-1 had decided to not to invest in Wanu.

14.   To date, neither PE Firm-1 nor the JV Partner has signed a term sheet with Wanu or invested in Wanu.

*Business With Retailer-1*

15.   Records from Retailer-1 indicate that in or around 2017 and 2018, Retailer-1 placed a number of purchase orders with Wanu for a total of approximately $300,000 worth of Wanu Water.

16.   In or around January 2020, Wanu's Vice President of Sales ("Wanu Executive-2") exchanged emails with a buyer for Retailer-1 (the "Retailer-1 Buyer") about the potential for Retailer-1 to order Wanu Water for stores in Texas and the Midwest.

17.   On or about January 28, 2020, the Retailer-1 Buyer emailed Wanu Executive-2 indicating that he had discussed the opportunity for Retailer-1 to buy Wanu Water at a meeting with other Retailer-1 buyers. At approximately 10:00 a.m. the same day, the Retailer-1 Buyer wrote to Wanu Executive-2, "The meeting [with Retailer-1 management] was today but was cancelled. We will present next week (Tuesday)" (the "January 28, 2020 Email").

18.   Throughout in or around February 2020, Wanu Executive-2 and the Retailer-1 Buyer continued to exchange emails about a potential Retailer-1 order of Wanu Water, including emails about packaging, timing, and promotion.

19.   On or about March 11, 2020, Retailer-1 placed two purchase orders with Wanu for Wanu Water, for a total of approximately $73,000. Retailer-1's records indicate that it received these two shipments in or around early May 2020 and that Retailer-1 also received two additional shipments of Wanu Water in or around late May 2020, for which it paid approximately $37,000. The total amount

Retailer-1 paid to Wanu in 2020 was approximately $110,000. Records further indicate that between in or around May 2020 and in or around June 2024, Retailer-1 did not place any further purchase orders with Wanu.

*Victim-1*

20. In or around September 2019, a friend introduced Victim-1 to O'GARA to discuss a potential investment in Wanu.

21. On or about September 19, 2019, O'GARA and Victim-1 met, and later spoke by phone, to discuss an investment by Victim-1 in Wanu. During those conversations, O'GARA told Victim-1 that he was a doctor and that he had formulated Wanu—applying his medical expertise—to address concerns about malnutrition in developing countries where he had traveled.

22. During conversations with Victim-1, O'GARA stated that Wanu had recently been valued by outside investors at approximately $30 million.

23. On or about September 24, 2019, Victim-1 sent O'GARA a signed subscription agreement for the purchase of preferred stock in Wanu. On the same date, at O'GARA's direction, Victim-1 wired approximately $250,000 to a Wanu bank account at Bank-1, which O'Gara controlled ("Bank Account-1").

24. On or about September 24, 2019, in response to Victim-1's email sending the signed subscription agreement, O'GARA wrote, "Thank you [Victim-1's first name]! . . . I will text you later this week / early next week when we expect the term sheet from [PE Firm-1]."

25. O'Gara had no basis to make this representation. In fact, Wanu Executive-1 did not even send the Diligence Material until the day after Victim-1's investment. Furthermore, O'GARA had sent a term sheet to PE Firm-1 approximately two weeks earlier, and PE Firm-1 had not yet told O'GARA whether it intended to accept the term sheet (let alone send its own term sheet). Ultimately, PE Firm-1 declined to invest in Wanu.

26. In or around August 2020, O'GARA asked Victim-1 for an approximately $50,000 loan to Wanu. O'GARA claimed that Wanu needed the loan to pay a contract packager[1] to complete a production run. Victim-1 agreed to give Wanu a $50,000 loan that would be convertible to equity.

---

[1] A contract packager, or co-packer, is a manufacturer that produces a product on behalf of another company based on that company's specifications.

27.  On or about August 19, 2020, O'GARA sent Victim-1 an email saying, "Thanks again for the $50k .Really appreciate it and this will allow us to to [sic] finish production for fulfillment ."

28.  On or about August 20, 2020, Victim-1 wired approximately $50,000 to Bank Account-1. Before the $50,000 wire from Victim-1 was credited to Bank Account-1, the account had an approximately $1,729.59 deficit.

29.  On or about August 21, 2020, there were two transfers from Bank Account-1: an approximately $5,853.44 wire transfer to an insurance broker and an approximately $41,915.79 transfer to a second Wanu bank account at Bank-1 ("Bank Account-2"), which O'Gara also controlled. On or about August 21, 2020, there was an approximately $42,444.96 payment from Bank Account-2 to a payroll provider. No money was transferred from either Bank Account-1 or Bank Account-2 to a contract packer in or around August 2020.[2]

30.  Victim-1 made approximately two additional investments in Wanu: approximately $55,000 on or about March 4, 2021, and approximately $100,000 on or about February 17, 2022.

*Victim-2*

31.  On or about February 4, 2020, O'GARA emailed Victim-2 to solicit an investment in an offering of preferred shares of Wanu. In one email, O'GARA made a number of representations about Wanu's product, its positioning in the market, its recent sales growth, and its developing marketing partnerships ("Email-1"). In a second email, O'GARA discussed a potential investment from PE Firm-1 in Wanu ("Email-2").

32.  In Email-1, O'GARA claimed that, "Early February purchase orders for the first time will eclipse the $1 million mark for revenue in a month[.]" O'GARA credited this revenue surge to, among other things, a false claim that an order from Retailer-1 "will ship February with $700K + purchase order hitting in early Feb[.]"

33.  O'GARA included several attachments to Email-1, including a screenshot of what appears to be a doctored version of the January 28, 2020 Email between Wanu Executive-2 the Retailer-1 Buyer. The screenshot O'GARA sent to Victim-2 reads, "The meeting was today but was cancelled. The PO will be for 20 truck loads of product , 3 sku's as we discussed. We will send next week (Tuesday)."

---

[2] In or around late August 2020, Wanu transferred a total of approximately $1,000 each to two packaging supply companies, approximately $1,000 to a distributor, and approximately $2,350 to a logistics company.

34. Contrary to O'GARA's claim that Retailer-1 was preparing to order more than $700,000 worth of Wanu Water in February of 2020 alone, Retailer-1's initial March 2020 order was for only approximately $73,000. According to Retailer-1 records, between in or around 2017 and in or around June 2024, Retailer-1 ordered a total of approximately $412,000 worth of Wanu Water.

35. In Email-2, O'GARA wrote that Wanu's "biggest news" was that PE Firm-1 was "courting" Wanu. O'GARA added that if Wanu were acquired at a similar price to a competitor, "[i]ndividuals that invest in the preferred round . . . would make close to $ 10 million on their investment."

36. On or about February 16, 2020, O'GARA emailed Victim-2, again attaching a forged document that he falsely claimed was an "executed /initialed term sheet from myself and the portfolio manager of the fund . " The forged term sheet purported to contemplate a $4,000,000 cash investment by PE Firm-1 in Wanu based on a $40,000,000 pre-investment valuation of Wanu.

37. On or about February 26, 2020, Victim-2 signed two subscription agreements—one for Victim-2 and one for an entity Victim-2 owned and controlled (the "Victim-2 Entity")—each for the purchase of preferred stock in Wanu for approximately $250,000.

38. On or about February 27, 2020, Victim-2 sent two wires for approximately $250,000 each to Wanu, one from Victim-2's personal account and one from the Victim-2 Entity's account. These wire transfers were sent to Bank Account-1 by interstate wire through the District of New Jersey via Fedwire.

39. According to Victim-2, the purported PE Firm-1 term sheet was the primary reason for the investments. PE Firm-1 never agreed to invest in, and never executed a term sheet with, Wanu.

*Victim-3*

40. Victim-3, and others in Victim-3's family, made several investments in Wanu between in or around 2019 and 2021, totaling approximately $857,000. During this period, O'GARA made several misrepresentations to Victim-3, including misrepresentations about an investment from PE Firm-1 and purchase orders from Retailer-1.

41. On or about January 29, 2020, O'GARA emailed Victim-3 claiming that Retailer-1 made a purchase order of approximately $734,448 for Wanu Water. At the bottom of the email O'Gara included the same doctored version of the January 28, 2023 Email that he had sent to Victim-2.

42. On or about February 8, 2021, O'GARA sent Victim-3 a text message falsely claiming that PE Firm-1 valued Wanu at $300,000,000.

43.     On or about May 18, 2021, family members of Victim-3 invested an additional $75,000 in Wanu.

44.     On or about July 27, 2021, O'GARA sent Victim-3 an email attaching what purported to be a May 10, 2021 term sheet memorializing an agreement by PE Firm-1 and the JV Partner to invest a total of $10 million in Wanu preferred stock at a valuation of $105 million. As discussed above, PE Firm-1 and the JV Partner never executed a term sheet for an investment in Wanu.

45.     Between in or around August 2019 and May 2023, O'GARA solicited a total of at least approximately $3.4 million from individual investors as part of the fraudulent scheme.